**FARM CREDIT BANK OF TEXAS,
f/k/a Federal Land Bank of
Texas, Appellant,**

v.

**Henry O. OGDEN, Jr., Individually and as Guardian of the Estate of Melissa Ruth Ogden, Mary Ogden Hayden, Melissa Ruth Ogden, and Bessie Ogden, Individually and as Testamentary Trustee of the Trust of John L. Ogden, Deceased, Appellees.**

No. 01–92–01052–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 11, 1994.

Larry E. Meyer, Mary A. Van Kerrebrook, Houston, for appellant.

Neal J. Iverson, Dayton, for appellees.

Before O'CONNOR, HEDGES and ANDELL, JJ.

## OPINION ON MOTION FOR REHEARING

O'CONNOR, Justice.

We grant appellees' motion for rehearing. We withdraw our original opinion and substitute this opinion in its place.

This lawsuit involves competing lien interests. We reverse the trial court's judgment regarding the 533–acre tract sold to the Blackwells and remand to the trial court to enter a judgment in favor of the Bank on that tract of land. In all other respects, we affirm the trial court's judgment.

Farm Credit Bank of Texas (the Bank) appeals a judgment declaring the purchase money liens held by appellees, Henry O. Ogden, Jr., individually and as guardian of the estate of Melissa Ruth Ogden, Mary Ogden Hayden, Melissa Ruth Ogden, and Bessie Ogden, individually and as testamentary trustee of the trust of John L. Ogden, deceased (collectively, the Ogdens), superior to the deed of trust lien held by the Bank.[1]

## Facts

In 1977, the Ogdens held title to about 926 acres of real property in Jefferson and Chambers counties. On February 22, 1977, the Ogdens borrowed $160,000 from Prudential Insurance Company, and granted to Prudential a deed of trust lien on 724 acres of the property. Prudential did not have a lien on the Ogdens' 200–acre rural homestead nor on a two-acre tract on the east boundary of the property. The deed of trust to Prudential contained a "due on sale" clause, which provided that the entire balance of the Prudential indebtedness would become due in the event the Ogdens sold the encumbered 724 acres.

On December 8, 1980, the Ogdens contracted to sell part of their land to John and Mary Blackwell and part to Jess Matthews. The Blackwells purchased 693.75 acres and Matthews purchased the remaining 191 acres south of Spindletop Bayou.[2] Under the provisions of the contract of sale, each of the buyers would assume their pro rata share of the Prudential note and give the Ogdens a second lien note for the remainder of the purchase price.

The Prudential lien encumbered the 191 acres sold to Matthews and 533 acres of the 693.75 acres sold to the Blackwells. The Prudential lien did not encumber the 164 acres sold to the Blackwells that were part of the Ogden homestead or the two acres on the east boundary of the property. The contract of sale presumed that Prudential would allow Blackwell and Matthews to assume the Prudential note. Further, the contract of sale provided that the Ogdens' lien would be subordinated to the Prudential lien, which the Blackwells and Matthews were to assume under the contract. For a graphic rendition of the property and its division, see the appendix.

On February 19, 1981, the Ogdens' attorney wrote a letter to Prudential stating:

---

1. The judgment also ordered judicial foreclosure of the Bank's second lien.

2. The Ogdens retained 36 acres of the property as their residence.

As part of the proposed sale, Mr. Blackwell has agreed to assume payment for the entire indebtedness to Prudential. However, Prudential's lien extends to property that will be purchased by both Mr. Blackwell and Mr. Matthews. As a consequence of the "due on sale" clause . . . it is imperative that Mr. Blackwell and Mr. Matthews have a prior, written arrangement with Prudential concerning the possible acceleration of the note as provided for in the Deed of Trust.

Mr. Blackwell and Mr. Matthews are in the process of making application to a financial institution for the purpose of discharging the Prudential indebtedness.

It is anticipated that this will take from 120–150 days. Under these circumstances, Mr. Blackwell and Mr. Matthews would request a written commitment from Prudential allowing 120–150 days for this new loan to be processed. At the expiration of that time, Prudential could proceed with acceleration of the indebtedness and foreclosure if the Prudential debt had not been fully discharged.

For your information, as part of the Ogden sale to Blackwell–Matthews, there will be an inferior lien note in favor of the Ogdens.

We would appreciate a written response, directed to my address above, approving this request.

Prudential responded to the Ogdens' attorney's letter, by letter dated February 23, 1981, as follows:

As attorney for the [Ogdens] . . . you informed Prudential, the holder of the note and lien, that your clients wished to sell the property which is the security for the note. This alienation does not have Prudential's approval.

[U]nder paragraph 15 . . . of the Deed of Trust, such alienation, at the option of the holder, shall cause the entire outstanding indebtedness to be immediately due and payable. As holder of the note, [Prudential] agrees, at your request, notwithstanding such alienation, that it will not exercise its power of sale for default . . . until July 21, 1981.

The Ogdens' lawyer signed the bottom of the letter, signifying his agreement with the terms.

Before the closing, Prudential agreed to give the Ogdens a grace period until July 21, 1981, to allow the buyers time to refinance the note. The Blackwells and Matthews agreed that the Blackwells alone would refinance the entire Prudential note. The Blackwells expressly assumed the Prudential note in the warranty deed from the Ogdens to the Blackwells.

On March 1, 1981, the sale of the property to the Blackwells and to Matthews closed. The earnest money contract contained a provision that the Blackwells and Matthews would assume the Prudential note, even though by that date the parties knew Prudential would not permit the buyers to assume the note; Prudential wanted the note paid off and planned to assert its "due on sale" clause. The contract provided that the notes from the Blackwells and Matthews would be inferior to the Prudential note. The deeds executed by the Ogdens to the buyers acknowledged that the buyers would assume the Prudential debt and give Ogden an inferior lien.

The closing statement, signed by Mr. Ogden, described two loans, one for $147,200, described as "assumed" and the other for $278,792, described as "2nd lien." The promissory note signed by the Blackwells described the note to the Ogdens as subordinate to the Prudential lien, which was to be "assumed" by the Blackwells.

The Blackwells granted deeds of trust to the Ogdens to secure payment of their promissory notes executed in favor of the Ogdens for the purchase of the property. The deeds of trust covered the 693.75 acres purchased by the Blackwells, and they were recorded on March 11, 1981. Matthews also granted deeds of trust to the Ogdens to secure payment of his promissory notes in favor of the Ogdens for the purchase of the 191 acres. Matthews' deeds of trust were also recorded on March 11, 1981. All the deeds of trust from the Blackwells and Matthews state that the Ogden liens are second and inferior to the Prudential lien.

On August 19, 1981, the Blackwells executed a promissory note to the Bank for $147,200 and secured the note with a deed of trust. The Bank's lien covered all 693.75 acres the Blackwells purchased from the Ogdens. The Bank's lien included the isolated two-acre tract not included in the Prudential lien and 164 acres of the 200 acres originally claimed by the Ogdens as their homestead and not included in the Prudential lien. The Bank's lien also included the 533 acres purchased by the Blackwells that were subject to the Prudential lien. The Bank's lien expressly excluded the 191 acres sold to Matthews that were subject to the Prudential lien.

The Bank agreed to lend the Blackwells the money to pay the balance of the Prudential debt on the condition that it receive a first lien on the Blackwells' property and the Ogden lien was subordinated to its lien. The evidence shows that the Bank intended to have a first lien on the property covered by its deed of trust. The loan application shows that the Bank was making the loan as a first lien holder and that it believed that the Ogdens were not yet lien holders, but eventually would become second lien holders.

Before closing with the Blackwells, the Bank learned that the Ogdens had a lien on the Blackwell property. The Bank's title opinion and written instructions for closing state that a second lien in favor of the Ogdens is permitted. The Bank's attorneys prepared and sent to the closing title company a second lien agreement to subordinate the Ogden liens to the Bank's lien. The Bank gave the title company the instruction to have the second lien agreement executed or not to close. The Bank also instructed the title company to insure the loan as a first and prior lien on the property, which it did. The Bank believed the agreement had been signed by the Ogdens before closing. The title company issued the Bank a title policy, indicating the Bank was the first lien holder.

On August 24, 1981, the loan proceeds were disbursed by the Bank through the title company closing officer to Prudential to pay the balance of the Ogdens' note. The evidence shows that the Blackwells obtained the loan to pay the balance of the Prudential debt, and that the loan proceeds did in fact pay off the Prudential debt. In September 1981, the Ogdens received notice from Prudential that the note had been fully paid and that the lien would be released. Prudential signed and recorded a lien release in favor of the Ogdens. In September 1987, when the Blackwells defaulted on the note to the Bank, the Bank discovered that the second lien agreement had not been signed by the Ogdens and that the Ogdens were claiming a first lien position. This lawsuit followed.

After the trial of this case to the court, the trial court made numerous findings of fact, including the following:

14. The Bank's 1981 deed of trust executed by the Blackwells expressly excluded the 191.0 acre tract purchased by Matthews from [the Ogdens].

15. The Bank's August 1981 deed of trust executed by the Blackwells included 165.0 acres that had not been mortgaged under the 1977 Prudential deed of trust.

16. The August 19, 1981, deed of trust executed by the Blackwells for the benefit of the Bank was not in renewal and extension of the 1977 Prudential note/deed of trust, nor was it in renewal and extension of any existing Bank loan.

17. As part of the closing of the Blackwells' $147,200.00 loan with the Bank in August 1981, the 1977 Prudential deed of trust lien was terminated pursuant to a full release of liens executed by Prudential.

18. The termination of the 1977 Prudential deed of trust lien was intended as part of the August 1981 Bank/Blackwells loan transaction.

19. The 1977 Prudential deed of trust lien was not preserved by the August 1981 deed of trust executed by the Blackwells for the benefit of the Bank.

20. The August 1981 deed of trust executed by the Blackwells for the benefit of the Bank created an entirely new deed of trust lien.

21. The collateral for the Bank's August 1981 deed of trust lien was different from the collateral in the 1977 Prudential deed of trust.

22. The creation of a new deed of trust lien was intended.

23. The Bank stipulated that its August 1981 deed of trust lien was a new lien.

24. The Bank did not intend to be subrogated to Prudential.

25. The Bank required that a subordination agreement be executed by [the Ogdens] as part of the Bank's August 1981 loan closing with the Blackwells.

27. The Bank admitted that the execution of the subordination agreement by [the Ogdens] was necessary for the Bank to have a first lien on the Blackwells' 693.75 acres of land.

30. [The Ogdens] never agreed to execute the subordination agreement.

In its conclusions of law, the trial court found that the Bank had no lien on the 191 acres sold to Matthews, and that the Ogdens' liens were first and superior to the Bank's lien on the 164 acres that had not been mortgaged to Prudential and that were part of the original Ogden homestead, the two-acre tract not mortgaged to Prudential, and the entire 693.75 acres of land purchased by the Blackwells from the Ogdens. The trial court concluded, therefore, the Bank was not entitled to subrogation or equitable subordination.

### Standard of review

Findings of fact in a case tried to the court have the same weight as a jury's answers to questions in the charge. *Stern v. Wonzer,* 846 S.W.2d 939, 942 (Tex.App.—Houston [1st Dist.] 1993, no writ). Findings of fact are not conclusive when a complete statement of facts appears in the record. *Pontiac v. Elliot,* 775 S.W.2d 395, 399 (Tex.App.—Houston [1st Dist.] 1989, writ denied). Findings of fact are binding on this Court only if supported by evidence of probative force. *Id.* Although a trial court's conclusions of law may not be challenged for factual insufficiency, the trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *Airflow Houston, Inc. v. Theri-*

ot, 849 S.W.2d 928, 931 (Tex.App.—Houston [1st Dist.] 1993, no writ).

The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them. *Stern,* 846 S.W.2d at 942. The same standards apply in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question a they do in reviewing the trial court's findings of fact. *Id.* In reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences that, when viewed in their most favorable light, tend to support the finding, and disregard all evidence and inferences to the contrary. *Id.* If there is any evidence of probative force, we must overrule the point and uphold the finding. *Id.* In reviewing the factual sufficiency of the evidence, we examine all of the evidence, both the evidence that supports the finding and the evidence that controverts the finding. *Id.* We will set aside the finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.*[3]

### Equitable subrogation to 533–acre tract

■ In points of error one and two, the Bank complains that the evidence is legally and factually insufficient to support the trial court's finding that the Bank's lien was not equitably subrogated to the Prudential lien on the 533–acre tract of land sold to Blackwell and covered under the Prudential lien. We agree.

■ When equitable subrogation is an issue, each case is usually controlled by its own facts. *Providence Inst. for Sav. v. Sims,* 441 S.W.2d 516, 519 (Tex.1969). In general, the purpose of the doctrine is to prevent the unjust enrichment of the debtor who owed the debt that is paid. *First Nat'l Bank v. O'Dell,* 856 S.W.2d 410, 415 (Tex.1993). Equitable subrogation substitutes another person in the place of a creditor so that the person in whose favor subrogation is applied succeeds to the rights of the creditor in relation to the debt. *Chicago Title Ins. Co.*

**3.** We disagree with the Ogdens' general reply point that asserts the Bank has waived all errors because in its brief, the Bank only refers to the trial court's judgment and not to the specific findings of fact.

*v. Lawrence Inv., Inc.,* 782 S.W.2d 332, 334 (Tex.App.—Fort Worth 1989, writ ref'd).

The Texas Supreme Court has long recognized the doctrine of equitable subrogation. *Faires v. Cockrill,* 88 Tex. 428, 31 S.W. 190, 194 (1895). In *Faires,* the court held that a person paying a debt, not being a volunteer, will be subrogated to the liens and priorities of the original creditor to the extent that he makes payments on the debt. *Id.* The court stated:

> Perhaps the courts of no state have gone further in applying the doctrine of subrogation than has the court of this state.... One who discharges the vendor's lien upon lands—even the homestead,—either by paying as surety, or at the request of the debtor, or at a judicial sale, which, for irregularities in the process, fails to convey the title, is entitled to be subrogated to the lien of the creditor to the extent of the payment so made.

*Id.* The Supreme Court in *Diversified Mortgage Investors v. Lloyd D. Blaylock Gen. Contractor, Inc.,* 576 S.W.2d 794, 807 (Tex. 1978), restated the importance of the doctrine of equitable subrogation to the lenders in this state: "It serves to protect a lienholder from intervening liens, at least to the amount of the initial lien, when the lienholder has discharged a prior, superior lien."

The Prudential lien covered 533 acres of the 693.75-acre tract of land purchased by the Blackwells. The Bank's lien expressly included this 533-acre tract. For the reasons stated below, we find that the Bank's lien on this 533 acres is equitably subrogated to the Prudential lien and superior to the Ogden lien.

The Ogdens incurred the $160,000 debt with Prudential. When the Ogdens sold the 533 acres to the Blackwells in March 1981, a balance of $147,200 remained on the Prudential note. Although the deed from the Ogdens to the Blackwells states that the Blackwells assumed the Prudential debt, Prudential did not authorize the Blackwells to assume the Ogdens' debt. In fact, Prudential accelerated the note by exercising its "due on sale" clause. It did, however, as a concession to the Ogdens, agree not to exercise its power of sale until July 21, 1981. Prudential expressly stated that the note and deed of trust securing the note would remain in full force as originally executed. Thus, the Ogdens were still liable on the Prudential note.

The Blackwells and the Ogdens closed the sale of the 533-acre tract with the understanding that the Blackwells would obtain other financing for the Prudential debt. The Blackwells obtained financing from the Bank and used the loan proceeds to pay the Prudential debt. Prudential signed a release in favor of the Ogdens. The evidence shows that the Bank intended to have a first lien on this 533-acre tract. The Bank made the loan to the Blackwells with the understanding that the proceed would pay off the Prudential debt and that it would have a first lien on the 533 acres. The Bank explicitly conditioned the closing of the Blackwell loan on having a first lien on the property, and the Bank instructed the title company to insure the loan as a first and prior lien. Any fact finding to the contrary is not supported by the evidence.

■ At closing, the title company failed to have the Ogdens sign the second lien agreement. This inadvertence precludes the Bank from asserting contractual subordination as to the Ogdens. It does not preclude, however, the application of the doctrine of equitable subrogation. The fact remains that if the Bank had not paid the Prudential debt with the Blackwell loan proceeds, the Ogdens would have been liable for the entire balance after July 21, 1981. The Bank stepped into Prudential's lien position with respect to the 533-acre tract, and its lien is subrogated to the Prudential lien. *Diversified,* 576 S.W.2d at 807. This equitable subrogation does not prejudice the Ogdens, but leaves them in the same position they were in on the date they recorded their deed of trust liens. *See Houston Inv. Bankers Corp. v. First City Bank,* 640 S.W.2d 660, 663 (Tex.App.—Houston [14th Dist.] 1982, no writ).

■ On appeal, the Ogdens contend that this case is distinguishable from other subrogation cases, and therefore, the doctrine of equitable subrogation does not apply. First, they argue that the Bank stipulated before trial that a second lien agreement was re-

quired for the Bank's lien to be superior to the Ogdens' lien. The stipulation cited by the Ogdens merely states that the Bank's closing instructions to the title company required the execution of a second lien agreement to subordinate the Ogdens' liens to the Bank's lien. The Bank's closing instructions and title opinion support the stipulation. We do not find that the Bank's desire for contractual subordination precludes the application of equitable subrogation principles.

■ Second, the Ogdens contend that the Bank's lien was a new lien, and equitable subrogation does not apply. A lender's right to subrogation is not affected by the lender obtaining a release or a discharge of the earlier lien, rather than an assignment. *Med Ctr. Bank v. Fleetwood,* 854 S.W.2d 278, 287 (Tex.App.—Austin 1993, writ denied); *Leonard v. Brazosport Bank,* 628 S.W.2d 216, 220 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.).

The trial court erred as a matter of law in its findings on the 533–acre tract and in denying the Bank equitable subrogation as to the 533 acres. Therefore, we sustain point of error one.

Because we sustain the Bank's legal sufficiency challenge, we do not need to address point of error two, the Bank's factual sufficiency challenge.

**Equitable subrogation to 191–acre tract**

■ In points of error three and four, the Bank complains that the evidence is legally and factually insufficient to support the trial court's finding that the Bank's lien was not equitably subrogated to the Prudential lien on the 191–acre tract of land sold to Matthews and covered under the Prudential lien. We disagree.

The evidence shows that the 191 acres sold to Matthews was covered by the 1977 Prudential deed of trust. The evidence also shows that the 191 acres were excluded from the Bank's lien. The Bank's witnesses testified that its lien did not include the 191

acres, and the Bank's deed of trust and all other loan documents expressly excluded the 191 acres sold to Matthews. The trial court concluded that the Bank had no lien on the 191 acres sold to Matthews and that the Ogdens held the only lien on the 191–acre tract.

The Bank argues that, even though its lien did not include the 191 acres, the principles of equitable subrogation should apply to give it a first and prior lien on the 191 acres. Citing *Diversified,* the Bank argues that it stepped into the rights and lien priorities of Prudential to the extent of the Prudential lien. The Bank contends because the Prudential lien included the 191 acres, the Bank is subrogated to Prudential's rights.

In reviewing cases on equitable subrogation, we have found no case that involves liens secured by different property. In point of error one, we held the Bank's lien was equitably subrogated to a portion of the Prudential lien. Both the Bank and Prudential had liens on the identical security, namely the 533 acres. The Bank's lien can be equitably subrogated to the same extent of the Prudential lien and to the same extent that the Bank has a lien on the property involved. The Bank did not have a lien on Matthews' 191 acres. The Bank, therefore, has no lien on his property to be subrogated.

We overrule points of error three and four.

**Equitable subordination of the 164–acre and two-acre tracts**

■ The Bank next complains that the trial court erred by not equitably subordinating the Ogden liens to the Bank's lien on the 164–acre and two-acre tracts sold to the Blackwells.[4] The Bank argues that the Ogden lien on the 164 acres should be subordinated to its lien because the Ogdens acknowledged that they did not pay the $147,200 balance of the Prudential note, and because the Ogdens recognized that as part of the sale to the Blackwells and Matthews, they would be taking inferior lien notes.[5]

4. The Bank argues that the 533–acre tract lien should also be subordinated. Because we have held that the lien to that tract is subrogated to

the Ogden's lien, it is not necessary to address it under this point.

5. The Bank cannot claim a subrogation lien on the 164–acre and two-acre tracts because they

Equitable subordination is often grounded upon a finding that the lien holder on a piece of property, through its inequitable conduct, conferred an unfair advantage to himself at the expense of the subordinate lien holders. *First Heights Bank v. Gutierrez,* 852 S.W.2d 596, 609 (Tex.App.—Corpus Christi 1993, writ denied). A party holding an earlier lien has a superior claim to a person holding a later lien, unless the earlier lien is displaced by some act of the party holding it; in such case, the law will regard the party holding the earlier lien as the later claimant. *Id.* The doctrine of equitable subordination does not apply unless the party whose lien is to be subordinated acted inequitably to warrant the subordination of its liens. *See Allied Bank v. Plaza DeVille Assoc.,* 733 S.W.2d 566, 571 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.).

The trial court found that the Ogdens did nothing inequitable with respect to the Bank and its August 1981 loan to the Blackwells. The evidence shows that the Ogdens were not contacted to attend the loan closing between the Bank and the Blackwells and that the Ogdens were not asked to sign a second lien agreement until September 1987, six years after the loan closing. The Ogdens were not made a party to any aspect of the loan transaction between the Bank and the Blackwells. The evidence supports the trial court's finding that the Ogdens did nothing inequitable regarding the Bank.

The Bank cites the letter from the Ogdens' attorney to Prudential as evidence that the Ogdens knew that their lien would be inferior to whomever provided financing to the Blackwells. In the letter, the Ogdens' attorney asks Prudential for 120 to 150 days for the

were not included in the Prudential lien. Subrogation will only assist the Bank on the land

Blackwells and Matthews to obtain financing to pay off the Prudential indebtedness before Prudential exercised its "due on sale" clause. The letter does not support the Bank's position because Prudential could only accelerate the indebtedness and foreclose on the acres on which it had a lien, namely, the 533–acre and 191–acre tracts. Prudential's lien did not extend to the 164–acre and two-acre tracts. The Ogdens' attorney acknowledged that the Ogdens would take an inferior lien on the acres encumbered by the Prudential lien. Again, there was no lien at the time on the 164–acre and two-acre tracts.

Moreover, all the deeds of trust from the Blackwells and Matthews state that the Ogden liens are second and inferior to the *Prudential* lien. The 164–acre and two-acre tracts were not encumbered by the Prudential lien. The evidence cited by the Bank does not support the conclusion that Ogdens knew that the Bank would require a first lien on acres that were not encumbered by the Prudential lien.

We overrule points of error five and six.

We reverse the trial court's judgment regarding the 533–acre tract and remand to the trial court to enter a judgment declaring the Bank's August 19, 1981 deed of trust lien on the 533–acres tract, which is part of the 693.75 acres sold to the Blackwells, to be superior to the Ogdens' March 1, 1981 purchase money liens. The Bank's superior deed of trust lien is described and set forth in a deed of trust recorded in Volume 2029, Pages 457–462, of the M & L Records of Jefferson County, Texas.

In all other respects, we affirm the trial court's judgment.

covered by the Prudential lien.