In re MID–AMERICA PETROLEUM, INC., et al., Debtors.

FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,

v.

MID–AMERICA PETROLEUM, INC., et al., Defendants.

Bankruptcy No. 587–50046–11.

Adv. No. 587–5016.

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

March 1, 1988.

Nicholas Katsonis, Palmer & Palmer, Dallas, Tex., for debtor.

T. Ray Guy, Jenkens & Gilchrist, Dallas, Tex., for FDIC.

J. Robert Forshey, Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, Tex., for various M & M Claimants.

Scotta E. McFarland, Thompson & Knight, Dallas, Tex., for Halliburton Co.

Michael G. Kelley, Hollman, Lyon, Patterson & Durrell, Inc., Odessa, Tex., for Watson and Associates of Midland, Inc.

David L. Patterson, Maxwell, Godwin & Carlton, Dallas, Tex., for WellTech, Inc.

Darrell Smith, Smith & Shackelford, P.C., Midland, Tex., for Linco–Electromatic, Inc.

Darrell W. Moore, Wagstaff, Alvis, Stubbeman, Seamster & Longacre, Abilene, Tex., for West Texas Utilities Co.

Neil J. Orleans, Wise, Stuhl, Andres, Orleans & Morris, Dallas, Tex., for Dowell Schlumberger, Inc.

Morris Reese, Jr., Logan, Lear, Gossett, Harrison, Reese & Wilson, San Angelo, Tex., for Falcon Well Service Co.

Walter C. Kellogg, Trustee–in–Bankruptcy, Dallas, Tex., Trustee for MAP.

Daniel C. Stewart, Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for Trustee.

Harrel L. Davis, III, Grambling & Mounce, El Paso, Tex., for Unsecured Creditors Committee.

Robert W. St. Clair, Curry, Curry, & Robinson, Lubbock, Tex., for Elec. Submersible Pumps, Inc.

## MEMORANDUM OF OPINION ON ISSUES OF MINERAL CONTRACTOR AND ACCOUNTS RECEIVABLE

JOHN C. AKARD, Bankruptcy Judge.

The Debtor in the captioned proceeding under Chapter 11 of the Bankruptcy Code, Mid–America Petroleum, Inc. (MAP), owned a fractional working interest in various oil and gas leases in the Taylor–Link Field in Pecos County, Texas. Various third parties owned the balance of the working interest in each lease.[1] MAP entered into an operating agreement dated February 1, 1984 with the other interest owners.[2] MAP was designated as the operator to "conduct and direct and have full control of all operations on the Contract Area as permitted by and required by, and within the limits of, this agreement." (Article V.A.) Relevant portions of the Operating Agreement are set out on Exhibit A to this opinion.

Under the terms of the Operating Agreement, each working interest owner was to bear its proportionate share of the costs of drilling and producing the oil and gas wells.[3] MAP was to provide the services or cause them to be provided, pay for them and then bill the Non–Operators for their proportionate share.[4] At the time MAP filed for relief under Chapter 11 of the Bankruptcy Code the Non–Operators owed

substantial amounts for JIB's. MAP owed substantial sums to various suppliers of labor and materials (M & M Claimants) and to the Federal Deposit Insurance Corporation as the successor to the First National Bank of Midland, Texas (FDIC). This is a lien dispute between the M & M Claimants and the FDIC over those JIB's. It was stipulated at hearing that the amount owed on the JIB's was insufficient to cover either the debt to the M & M Claimants or the debt to the FDIC.

The lien claimed by the FDIC arose out of a security agreement dated August 23, 1982 executed by MAP in favor of the First National Bank of Midland, Texas in which MAP granted the bank a lien on:

All equipment, inventory, general intangibles, chattel paper, documents, goods of every nature or kind, accounts, together with all replacements, additions, substitutions, products exsessions and proceeds now owned or hereafter acquired by [MAP] ...

Prior to the M & M Claimants furnishing any goods or services the Bank filed an appropriate financing statement in the Texas Secretary of State's office perfecting the Bank's security interest. The FDIC asserted that the JIB's are accounts receivable and, thus, covered by its lien.

## MINERAL CONTRACTOR

Some M & M Claimants asserted that MAP was a mineral contractor under the Texas Liens Against Mineral Property statute[5] and, thus, the M & M Claimants, as mineral subcontractors, were entitled to the funds in the hands of the Non–Operators at the time the M & M Claimants

---

**1.** Apparently MAP's interest varies from lease to lease and the ownership of the remaining working interest varies from lease to lease. These other working interest owners are not parties to this proceeding.

**2.** The Operating Agreement of February 1, 1984 is a "Model Form Operating Agreement," American Association of Petroleum Land Men Form 610–1977. There is an Amendment to Operating Agreement effective November 1, 1984 and a Second Amendment to Operating Agreement which is not dated but stated to be effective as of February 1, 1984. References in this opinion

to the Operating Agreement mean the Operating Agreement of February 1, 1984 as amended.

**3.** Hereafter MAP will be referred to as MAP or the Operator. The other working interest owners will be referred to as the Non–Operators.

**4.** These billings are referred to in the Operating Agreement as joint-interest billings (JIB's).

**5.** Texas Property Code, Chapter 56. The relevant portions of that statute are set out on Exhibit B to this opinion.

served notices on the Non–Operators pursuant to the statute.[6]

The FDIC argued that it would be inconsistent for MAP, as a working interest owner, to also be considered a mineral contractor. Further, the FDIC asserted that the Operating Agreement did not call for MAP to perform labor or furnish materials and, thus, MAP did not fall within the definition of a mineral contractor under the statute.

 Working interest owners are co-tenants in the mineral estate. *Shaw & Estes v. Texas Consolidated Oils*, 299 S.W. 2d 307 (Tex.Civ.App.—Galveston 1957, writ ref'd n.r.e.) However when MAP signed the Operating Agreement it put on a different hat and became a mineral contractor with respect to the Non–Operators. MAP was empowered, within the specific limitations of the Operating Agreement, to see to the drilling and operation of the property. MAP had authority to provide labor and services itself or to have third parties provide them.[7]

The Court concludes that MAP was a mineral contractor under the terms of the Texas Liens Against Mineral Property statute and that the M & M Claimants are entitled to assert the rights of mineral subcontractors under that statute.

### ACCOUNTS RECEIVABLE

The FDIC argued that the JIB's are MAP's accounts receivable or, at the very least, general intangibles. The FDIC asserted that because of its prior filed financing statement on accounts receivable and general intangibles, it is entitled to all JIB's in the hands of the Non–Operators to the exclusion of the M & M Claimants. Conversely, the M & M Claimants asserted that MAP had no claim against the Non–Operators until it paid for the services provided by the M & M Claimants.

The Operating Agreement clearly obligated MAP to pay all expenses. Thereafter, MAP could bill the Non–Operators for their proportionate shares (the JIB's). However, MAP did not have a claim against the Non–Operators until MAP paid the M & M Claimants. Thus, MAP had no account receivable until it paid the M & M Claimants. Although the FDIC had a lien on accounts receivable at the time they arose, the accounts receivable in question did not arise until MAP paid the M & M Claimants and properly billed the Non–Operators.

### CONCLUSION

The Non–Operators are not parties to this proceeding. Until they are, this Court cannot determine proper disbursement of the JIB's. Additionally, it will be necessary to treat the wells separately and to ascertain for each the amounts owed the M & M Claimants, the amounts owed by each Non–Operator, and whether proper notices were given by the M & M Claimants with respect to that well. M & M Claimants who perfected their subcontractor's lien under the Texas Liens on Mineral Property statute have first claim to the funds trapped by their notices. The second claim to the proceeds of the JIB's is in favor of the unpaid M & M Claimants since it is for their services the Non–Operator is paying. The third claim to the JIB's belongs to the FDIC as holder of a lien on MAP's accounts receivable. These matters must be resolved by the Bankruptcy Court in order for the Debtor to ascertain the amounts due its creditors under its plan of reorganization. See *FDIC v. Majestic Energy Corp. (In re Majestic Energy Corp.)*, 835 F.2d 87 (5th Cir.1988). Although a Trustee-in-Bankruptcy presently operates the Debtor, the Court feels that a plan of reorganization will be proposed.

The attorneys for the Trustee, the M & M Claimants and the FDIC are ordered to

---

**6.** Each Non–Operator's liability is limited to its proportionate share of the expenses.

**7.** An oil and gas operating agreement does not create a partnership, joint venture, or mining partnership. *Luling Oil & Gas Co. v. Humble*

*Oil & Refining Co.*, 144 Tex. 475, 191 S.W.2d 716 (1945). The Operating Agreement in question specifically provided that it did not create a partnership.

meet within thirty days from the entry of this Memorandum to work out a procedure for serving the additional necessary parties and gathering the information necessary to conclude this adversary proceeding.

## EXHIBIT A

Selected provisions from the Operating Agreement.

Page 1, lines 10–12:

WHEREAS, the parties to this agreement are owners of oil and gas leases and or oil and gas interests in the land identified in Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and or oil and gas interests. . . .

Page 2, Article III.B., lines 15–18:

Exhibit "A" lists all of the parties and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A".

Page 3, Article V.A., lines 62–64:

MID–AMERICA PETROLEUM, INC. shall be the Operator of the Contracted Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of, this agreement.

Page 4, Article V.D., lines 34–36:

All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells. . . .

Page 4, Article VI.A., lines 62–68:

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test. . . .

If, in Operator's judgment, the well will not produce oil or gas in paying quanti-ties, and it wishes to plug and abandon the well as a dry hole, it . . . shall first secure the consent of all parties and shall plug and abandon same as provided in Article VI.E.1. hereof.

Page 8, Article VII.C., lines 52–63

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in the Accounting Procedure attached hereto as Exhibit "C". Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.

4. Exhibit "C", regarding the accounting procedures, contains the following terms:

## I. GENERAL PROVISIONS

1. Definitions.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

2. Statement and Billings.

Operator shall bill Non–Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month.

\* \* \* \* \* \*

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

4. Material

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.

5. Transportation

Transportation of employees and Material necessary for the Joint Operations....

6. Services

The cost of contract services, equipment and utilities provided by outside sources....

7. Equipment and Facilities Furnished by Operator

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with the costs of ownership and operation.

## EXHIBIT B

*Section 56.001.* Definitions

(1) "Mineral activities" means digging, drilling, torpedoing, operating, completing, maintaining, or repairing an oil, gas, or water well, and oil or gas pipeline, or a mine or quarry.

(2) "Mineral contractor" means a person who performs labor or furnishes or hauls material, machinery, or supplies used in mineral activities under an express or implied contract with a mineral property owner or with a trustee, agent, or receiver of a mineral property owner.

(3) "Mineral property owner" means an owner of land, an oil, gas, or other mineral leasehold, an oil or gas pipeline, or an oil or gas pipeline right-of-way.

(4) "Mineral subcontractor" means a person who:

(A) furnishes or hauls material, machinery, or supplies used in mineral activities under contract with a mineral contractor or with a subcontractor;

(B) performs labor used in mineral activities under contract with a mineral contractor; or

(C) performs labor used in mineral activities as an artisan or day laborer employed by a subcontractor.