# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-10969

In the Matter of:  HERITAGE CONSOLIDATED, L.L.C.,

Debtor,

ENDEAVOR ENERGY RESOURCES, L.P.; ACME ENERGY SERVICES, INCORPORATED, D/B/A RIG MOVERS EXPRESS, D/B/A BIG DOG DRILLING,

Appellants,

v.

HERITAGE CONSOLIDATED, L.L.C.; HERITAGE STANDARD CORPORATION,

Appellees.

United States Court of Appeals
Fifth Circuit

**FILED**

August 27, 2014

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and HIGGINBOTHAM and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Appellants Endeavor Energy Resources, L.P. and Acme Energy Services, Inc. (collectively, Drillers) performed work on Debtors' well, but were never paid.  Drillers subsequently filed a mineral lien on the well, and then a claim in Debtors' bankruptcy.  The bankruptcy court dismissed Drillers' constructive trust and equitable lien claims and granted summary judgment to Debtors on

No. 13-10969

Drillers' mineral contractor's and subcontractor's lien claims. The district court affirmed. We AFFIRM the district court's dismissal of Drillers' constructive trust and equitable lien claims. We REVERSE and REMAND the district court's grant of summary judgment on Drillers' mineral subcontractors' lien claims because Drillers submitted sufficient evidence to survive summary judgment.

I.

Heritage Standard Corporation (HSC) owned mineral property leases for a nonfunctioning oil well in Winkler County, Texas. This well was governed by a series of contractual arrangements. Because these contracts bear on Drillers' ability to recover on their claims, we will briefly outline them here. In January 2008, HSC entered into a farmout agreement (Staley Agreement) with George Staley to develop the well.[1] Staley then entered into an assignment contract (Lakehills Agreement) with Lake Hills Productions, Inc. (Lakehills) to perform the work. Staley, HSC, and Lakehills, along with well operator Stratco Operating Co., Inc. (Stratco) subsequently signed a Joint Operating Agreement (JOA) to develop the well. The JOA was made effective as of January 2008, and the parties all signed it between April and June of 2008.

Lakehills then sold and assigned its interests in the well to Trius Energy, LLC (Trius) in February 2008, and Trius was added to the JOA in September 2008. As a result, HSC was responsible for 12.5% of the well expenditures, and Trius was responsible for the remaining 87.5% of the expenditures. In July 2008, Lakehills replaced Stratco as the official well operator. Under this new

---

[1] A farmout is a contract "whereby a lease owner not desirous of drilling at the time agrees to assign the lease, or some portion of it . . . to another operator who is desirous of drilling the tract." 8-F Williams & Meyers, Oil Gas Law Scope. "The primary characteristic of the farmout is the obligation of the assignee to drill one or more wells on the assigned acreage as a prerequisite to completion of the transfer to him." *Id.*

2

No. 13-10969

arrangement, Lakehills was responsible for ensuring that necessary work was done on the well, and Trius and HSC were to make payments for this work to Lakehills.  In May, June, and July of 2008, Lakehills contracted with Drillers, who then performed work on the well during that same time period.

This arrangement apparently took a downward turn in the late summer of 2008.  Both Trius and HSC stopped making payments to Lakehills.  Lakehills then failed to pay Drillers for their work, and Drillers filed mineral liens against HSC to recover the money they were owed.  Drillers' liens were filed within the six month period required by the Texas statute, and HSC received notice as required under the statute for a subcontractor's lien.  *See* Tex. Prop. Code Ann. § 56.001–3, 0.21.  After Drillers filed their liens, HSC assigned its interest in the well to Heritage Consolidated.  Several of the other parties to these agreements subsequently defaulted on their contract obligations.  As a result, HSC, Heritage Consolidated, Trius, Stratco, Lakehills, and Staley negotiated a settlement agreement (Settlement Agreement) in May 2009.

Under the Settlement Agreement, Lakehills received a 1% interest in the well as consideration for releasing its operator liens against HSC and Heritage Consolidated (collectively, Debtors).  The Settlement Agreement also stipulated that Trius was obligated to satisfy Drillers' liens and to indemnify all other signees against claims arising from those liens.  In consideration for Trius's agreement to discharge the liens, Debtors forgave Trius's 87.5% share of the working expenses incurred by Debtors after Debtors took over well operations in November 2008.  Even after this settlement, no one paid Drillers for their services.

Debtors filed for Chapter 11 bankruptcy.  Drillers filed proofs of claim in their bankruptcies asserting secured lien claims and, alternatively, unsecured nonpriority claims.  Drillers also filed an amended complaint seeking a

3

No. 13-10969

determination of the validity, extent, and priority of their mineral liens.  The bankruptcy court entered judgment against the Drillers on all claims.  The bankruptcy court granted summary judgment to Debtors on Drillers' mineral contractors' and subcontractors' lien claims, and granted Debtors' motion to dismiss Drillers' additional claims for a constructive trust and equitable lien asserted in their amended complaint.  The district court affirmed, and Drillers appealed.

## II.

We review "the decision of a district court sitting as an appellate court in a bankruptcy case 'by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court.'" *Clinton Growers v. Pilgrim's Pride Corp. (In re Pilgrim's Pride Corp.)*, 706 F.3d 636, 640 (5th Cir. 2013) (quoting *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 542 F.3d 131, 134–35 (5th Cir. 2008)).  "'Generally, a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*.'"  *Id.* at 640 (quoting *In re SI Restructuring, Inc.*, 542 F.3d at 135).

We review a bankruptcy court's grant of summary judgment *de novo*.  *See Id.* (citing *SeaQuest Diving, LP v. S & J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411, 417 (5th Cir. 2009)).  When seeking summary judgment, the moving party—here, Debtors—bears the initial burden to demonstrate that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Once this initial burden is satisfied, the burden shifts and the non-moving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  We must draw inferences in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the non-

moving party's burden may not be satisfied by relying upon mere "conclusionary denials, improbable inferences, and legalistic argumentation." *S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

We also review the dismissal of claims pursuant to Rule 12(b)(6) *de novo*. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). We accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiffs. *Id.* at 603 (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)). However, "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152–53 (5th Cir. 2010) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gonzalez*, 577 F.3d at 603 (internal quotation marks and citations omitted).

"In this diversity action, we must apply Texas law as interpreted by Texas state courts." *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 593 (5th Cir. 2011) (quoting *Mid–Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000)). "We consider Texas Supreme Court cases that, while not deciding the issue, provide guidance as to how the Texas Supreme Court would decide the question before us." *Id.* at 594 (internal quotation marks and citation omitted). We also "consider decisions of the intermediate appellate courts in determining how the Texas Supreme Court would decide this issue. We are bound by our own precedent interpreting Texas law unless there has been an intervening change in authority." *Id.* (citations omitted).

## III.

Drillers first argue that the bankruptcy and district courts should not have granted summary judgment to Debtors on their contractors' and subcontractors' mineral lien claims. We agree that it was error to grant

No. 13-10969

summary judgment on Drillers' subcontractors' lien claims, and therefore do not reach the issue of whether Drillers were also entitled to contractors' liens.

A.

In Texas, material liens are creatures of statute, granted to "both mineral contractors and mineral subcontractors to secure payment for labor or services related to mineral activities, as therein defined." 56 Tex. Jur. 3d Oil & Gas § 678 (2014); *see also Trevor Rees–Jones, Tr. for Atkins Petroleum Corp. v. Trevor Rees-Jones, Tr. for Apache Services, Inc.*, 799 S.W.2d 463, 465 (Tex. App.—El Paso 1990, writ denied). Texas courts have repeatedly noted that the mineral lien statute is "designed to protect laborers and materialmen"[2] and should therefore be liberally construed. *Bandera Drilling Co., Inc. v. Lavino*, 824 S.W.2d 782, 784 (Tex. App.—Eastland 1992, no writ); *see also Youngstown Sheet & Tube Co. v. Lucey Prods. Co.*, 403 F.2d 135, 143 (5th Cir. 1968).

A mineral contractor is a person who "furnishes or hauls material" or "performs labor" under an express or implied contract with a mineral property owner or with a trustee, agent, or receiver of a mineral property owner. Tex. Prop. Code Ann. § 56.001(2). A mineral subcontractor is a person who "furnishes or hauls material" or "performs labor" under a contract with a mineral contractor. Tex. Prop. Code Ann. § 56.001(4). Contractors and subcontractors are treated interchangeably under the mineral lien statute, with two notable exceptions: First, subcontractors must give notice to the mineral owner when filing material liens, whereas contractors have no notice

---

[2] While the Texas statute calls these liens "mineral" contractor or subcontractor liens, the case law frequently refers to them as "material and mechanics" or "M&M" liens. Laborers are sometimes referred to as "materialmen" in the case law. These terms appear to be interchangeable.

requirement.[3]  Second, contractors must have a contractual relationship with a mineral owner, whereas subcontractors only need to have a contractual relationship with a contractor.

When determining whether a laborer is a subcontractor or a contractor, the important question is whether there is a *contractual relationship* between the owner and the laborer performing the work: If there is a direct contractual relationship between an owner and the laborer, then the laborer is a contractor with regard to that owner.  If there is a contract between the laborer and another party who has a contract with an owner, then the laborer is a subcontractor.  *See* Rhett G. Campbell, *A Survey of Oil and Gas Bankruptcy Issues*, 5 Tex. J. Oil Gas & Energy L. 265, 311–12 (2010).

If a well has multiple owners, it is possible for a single laborer to be both a subcontractor and a contractor for the work they perform on that well.  For example, the owners may collectively enter into an agreement that makes one owner the well operator, and gives that owner-operator the power to contract with laborers.  The laborers would then be contractors with respect to the contracting owner-operator, but subcontractors with respect to the other owners.  *See id.* at 311 ("In the typical transaction, the operator contracts directly with vendors but the non-operators do not.  A service company contracting with the operator is a contractor as to the operator (if the operator owns an interest in the lease) but a subcontractor as to non-operators.").  It is thus not only possible, but common within the industry for an owner to also be a contractor as defined by the statute.  *See In re Mid-Am. Petroleum, Inc.*, 83 B.R. 933, 935 (Bankr. N.D. Tex. 1988) (concluding that MAP was both a working interest owner and a mineral contractor); *Energy Fund of Am., Inc. v.*

---

[3] Drillers averred in their lien affidavit that they gave such notice to the owner (HSC), and Debtors do not contest this point.

*G.E.T. Serv. Co.*, 610 S.W.2d 833, 835–36 (Tex. Civ. App.—Eastland 1980), *aff'd in part and rev'd in part on other grounds sub nom.*, *Ayco Dev. Corp. v. G.E.T. Serv. Co.*, 616 S.W.2d 184 (Tex. 1981). Under these circumstances, "the service company would need to perfect its lien both ways, first as a subcontractor and second as a contractor" to secure a claim against all owners. Campell, *supra* at 312; *see also* Mitchell E. Ayer, 34 Energy & Min. L. Found. §7.08 (2013).

In order to determine whether Drillers were contractors or subcontractors with regard to Debtors, we therefore look to the various contractual relationships governing the well at the time that Drillers performed their work. Viewed in the light most favorable to non-movant Drillers, Drillers have raised a fact issue as to whether they were mineral subcontractors with regard to Debtors: Drillers presented evidence that Debtor HSC was an owner at the relevant time because HSC owned part of the working interest in the lease when Drillers performed their work and perfected their liens. Drillers also presented evidence that HSC was the record owner of 100% of the lease, and retained 12.5% of the working interest even after the various farmout agreements and assignments. Drillers presented evidence demonstrating that Lakehills was in a contractual relationship with HSC because Lakehills was the assignee of the Staley Agreement. Viewed in the light most favorable to Drillers, this evidence demonstrates that Lakehills was a contractor at the time that Drillers performed their work on the well. Drillers also put forth evidence showing that Lakehills contracted with Drillers to have Drillers perform work on the well. Taken together, these facts at the very least raise a genuine issue as to whether Drillers were mineral subcontractors with regard to Debtors at the time Drillers performed their work. Tex. Prop. Code Ann. § 56.001(2), (4).

No. 13-10969

B.

Debtors argue, and the bankruptcy and district courts agreed, that Drillers could not be subcontractors because Lakehills subsequently acquired a 1% ownership interest in the lease, and was thus a co-owner, rather than a contractor. According to Debtors and the bankruptcy and district courts, Lakehills's ownership interest "relates back" to the time prior to the inception of Drillers' work. The bankruptcy and district courts therefore reasoned that Drillers' liens could only attach to Lakehills's—and not Debtors'—interest in the lease. We disagree. As we explained above, it is possible under Texas law for an owner to also be a contractor, and for a laborer to secure liens against both the contracting and non-contracting owners. *See In re Mid-Am. Petroleum, Inc.*, 83 B.R. at 935; Campbell, *supra* at 311–12.

In reaching a contrary conclusion, the district court relied on the Texas Supreme Court's decision in *Diversified Mortgage Investors v. Lloyd D. Blaylock General Contractor, Inc.,* 576 S.W.2d 794 (Tex. 1978). Specifically, Debtors and the district court point to language in *Diversified Mortgage* to argue that Drillers' liens could only attach to Lakehills's interest—and not Debtors' interest—if Lakehills was an owner at the relevant time. The district court relied on the Texas Supreme Court's statement that "[o]ur courts have long held that a mechanic's and materialman's lien attaches to the interest of the person contracting for construction. Thus, if a lessee contracts for construction, the mechanic's lien attaches only to the leasehold interest, not to the fee interest of the lessor." *Diversified Mortg.*, 576 S.W.2d at 805. After reviewing the case law, we conclude that the district court incorrectly applied this decision and the accompanying "relation back" doctrine.

In *Diversified Mortgage*, general contractor Blaylock held contractor's liens on certain properties based on a construction contract with Dollar Inns. *Id.* at 796. The Texas Supreme Court explained that "[t]o further determine

the priority of the mechanic's lien, this court must decide whether Dollar Inns, the party contracting with Blaylock, held any legal or equitable interest in the property at the time of inception of this mechanic's [contractor] lien." *Id.* at 806. The Texas Supreme Court determined that:

> [A]t the time of inception of Blaylock's mechanic's lien, Dollar Inns held an equitable right or interest in the land under a contract of purchase to which such mechanic's lien could attach. Under the doctrine of after-acquired title, the security for such mechanic's lien was later expanded to include the legal title to the property acquired by Dollar Inns when the sale was consummated on April 5, 1973.

*Id.*

The Texas Supreme Court thus expanded the interest to which the lien attached based on the "relation back" doctrine. The Texas Supreme Court explained the "relation back" doctrine as follows:

> [T]he majority of the courts generally applies the doctrine of "after-acquired title" or the "relation back" doctrine. These doctrines hold that the lien attaches to whatever legal or equitable interest the contracting party had when the work was begun, and thereafter attaches to any other or greater interest whenever acquired before the lien is enforced: provided that the after-acquired title enlarges an estate or interest to which the lien has already become attached. Accordingly, the priority of a mechanic's lien not only depends upon the inception of the lien, but also upon whether the party contracting with the mechanic or the materialman has a legal or equitable interest in the property at the time of contracting.

*Id.* at 805–06 (internal citations and quotation marks omitted). In other words, the "relation back" doctrine is designed to *expand* the interest to which the lien can attach, thus helping to effectuate the statute's purpose in protecting laborers and materialmen. *See Youngstown*, 403 F.2d at 143; *Bandera Drilling*, 824 S.W.2d at 784.

We have previously given the Texas Supreme Court's decision in *Diversified Mortgage* a similar reading in *Matter of Waller Creek, Ltd.*, 867 F.2d

228, 234 (5th Cir. 1989). There, we addressed a contractor's lien claim and explained that the "relation back" doctrine:

> [H]olds that the lien attaches to whatever legal or equitable interest the contracting party had when the work was begun, and thereafter attaches to any other or greater interest whenever acquired before the lien is enforced: *provided that the after-acquired title enlarges an estate or interest to which the lien has already become attached.*

*Matter of Waller Creek, Ltd.*, 867 F.2d 228, 234 (5th Cir. 1989) (emphasis added). The "relation back" doctrine is therefore intended to expand the interest to which a lien can attach.

In contrast, the district court's construction of the "relation back" would have just the opposite effect: because Lakehills later acquired a greater interest than it had at the time of Drillers' work, Drillers would no longer be able to attach to HSC's continued interest, despite the fact that HSC had a 12.5% interest in the lease, whereas Lakehills only acquired a 1% interest in the lease. This application of the "relation back" doctrine thus shrank rather than enlarged the interest to which Drillers' liens could attach. If Lakehills gained a 1% ownership interest in the lease at the time that Drillers performed their work, then Drillers may have gained an *additional* claim for contractors' liens against Lakehills. It would not, however, prevent Drillers from asserting separate subcontractors' liens against HSC. Such a result would be contrary to the statutory scheme, which provides laborers with a method of recourse against both contractors *and* owners with whom they do not have privity of contract. *See* Campbell, *supra* at 311 ("The basic principle is that the service company who contracts through the operator and perfects a subcontractor's lien is entitled to a lien on all amounts due from non-operator-[owner]s to the

11

operator.").[4] The district court's application of this doctrine conflicts with both the language in *Diversified Mortgage*, and our own subsequent interpretation of the "relation back" doctrine. "We are bound by our own precedent interpreting Texas law unless there has been an intervening change in authority," and thus reject the district court's application of the doctrine here. *Gilbane Bldg. Co.*, 664 F.3d at 593 (citations omitted).

Moreover, the passage in *Diversified Mortgage* cited by the district court and Debtors discussed a *contractor's* rather than a *subcontractor's* lien. As we have explained, a contractor's lien requires privity of contract with an owner, whereas a subcontractor's lien does not. Placed in context, the *Diversified Mortgage* court was explaining that a contractor's lien could only attach to the interest of the party "contracting for construction." *Diversified Mortg.*, 576 S.W.2d at 805. It was not, as Debtors suggest, implying that a subcontractor's lien could not also be asserted against other owners. *See* Campbell, *supra* at 311. Instead, the *Diversified Mortgage* court was distinguishing between the ability of a contractor's lien to attach to a leasehold interest, and the lien's ability to attach to the real property on which the lease is located. It does not mean that a subcontractor cannot reach the leasehold interests of owners who have contracted with a contractor to have the labor performed.

Under Debtors' reading, the entire category of "subcontractors" under the statute would be superfluous, because a subcontractor *by definition* never has a contract with the owner. We reject such a reading. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 668 (2007) ("But this reading would render the regulation entirely superfluous."); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174

---

[4] Non-operator is an industry short-hand for "non-operating working interest owner" and refers to those owners who have not been designated as an operator of the lease. It is also possible to be an operator without being an owner.

(2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (footnote omitted)). In the case before us, the passage from *Diversified Mortgage* means only that Drillers' liens could not attach to an interest held by the real property owner on which the mineral lease was located.

Finally, the approach advocated by Debtors would allow HSC and Lakehills to alter Drillers' statutory rights to recover payment for the work Drillers performed by entering into a subsequent contract *after the completion of the work* that Drillers were not party to. It is undisputed that Lakehills was not a legal owner of any interest in the well in mid-2008 when Drillers performed their work. Lakehills later did receive a 1% working interest in the lease after Drillers had completed their work and perfected their liens. Indeed, Lakehills received this interest from a separate Settlement Agreement that had not even been contemplated at the time that Drillers performed the work.[5]

---

[5] Even assuming *arguendo* that the "relation back" doctrine could prevent Drillers from asserting subcontractors' liens against Debtors, it is not clear that Lakehill's interest actually would relate back to the time that Drillers performed their work. The district court noted that "[a]lthough it is a close question, the Court finds that under *Diversified, Hoffman*, and related cases, Lakehills was a mineral owner." *Endeavor Energy Res., L.P. v. Heritage Consol., LLC,* No. 3:12-CV-03765-B, 2013 WL 4045250, at *8 (N.D. Tex. Aug. 9, 2013). This case, however, is distinguishable from those cited by the district court. In *Hoffman v. Continental Supply Co.*, Lockhart and Humble Oil had already entered into a contract where Lockhart agreed to purchase leases and to complete some drilling activities. 120 S.W.2d 851, 854 (Tex. Civ. App.—Eastland 1938), *rev'd on other grounds*, 144 S.W.2d 253 (Tex. 1940). Similarly, in *Diversified Mortgage*, Dollar Inns had executed a contract to purchase the Irving property from First Madison and paid First Madison $200,000 prior to the inception of the mechanic's lien. *Diversified Mortg.*, 576 S.W.2d at 806. The court therefore concluded that "Dollar Inns held an equitable right or interest in the land under a contract of purchase to which such mechanic's lien could attach." *Id.* In contrast, there was no contract in place pursuant to which Lakehills would receive an ownership interest at the time that Drillers performed their work.

No. 13-10969

As one Texas appellate court reasoned:

> Can the issue of whether those who provide services and materials are contractors or subcontractors be dependent upon events that occur after the contract for such services and materials is made? We believe the answer should be "No". Having dealt with Atkins when that company owned all of the working interest and at a time when there is no question about its right or authority to contract for services and materials, the rights of those parties should not be governed by subsequent events between the owner and third parties who received assignments after the drilling cost had been incurred.
>
> . . .
>
> The lien claimants' status as contractors cannot be converted to that of subcontractors by another contract to which they are not privy.

*Trevor Rees-Jones*, 799 S.W.2d at 465–66.[6]  As Drillers note, if subsequent contracting by the owner of any portion of the mineral interest, no matter how small and whether or not the interest is filed of record, precluded a subcontractor's lien, then laborers would have little remedy for nonpayment. *See Youngstown*, 403 F.2d at 143 ("It is a rule of long standing that the mechanic's and materialman's lien statutes of this state will be liberally construed for the purpose of protecting laborers and materialmen." (internal

---

[6] Although not well briefed by the parties, there is another aspect of the Texas mineral lien statute that suggests that it is meant to protect subcontractors from going without pay:

> The mineral contractor chapter of the Texas Property Code also has a trapping statute. If an unpaid mineral subcontractor or supplier who has led a lien notice then also sends notice to working interest owners, the statute has a similar effect, "trapping" monies otherwise due and owing to the operator, so that they are to be paid directly to the mineral lien claimants instead. Like the similar provision for building subcontractors, the trapping statute is only available to those who have or are eligible to have a lien on the owner's property, but it does not expressly create a lien as such on the monies that are intended to be trapped.

*In re S. Tex. Oil Co.*, No. 09-54233-C, 2010 WL 1903750, at *1 (Bankr. W.D. Tex. May 10, 2010).

No. 13-10969

quotation marks and citation omitted)).  Viewed in the light most favorable to Drillers, these facts demonstrate that Drillers were subcontractors with regard to Debtors.  The district court therefore erred in granting summary judgment to Debtors on Drillers' subcontractors' lien claims.[7]

## IV.

We next turn to Drillers' argument that the bankruptcy court erred in dismissing their claims for relief for a constructive trust or equitable liens.  In dismissing the claims, the bankruptcy court reasoned that Drillers had insufficiently plead the existence of a fiduciary duty or fraud, which are necessary components of a constructive trust claim, and the district court affirmed.[8]  We agree.

A constructive trust requires a breach of fiduciary duty or fraud, accompanied by unjust enrichment of the wrongdoer and traceability to a *res*. *Haber Oil Co. v. Swinehart (In re Haber Oil)*, 12 F.3d 426, 437 (5th Cir. 1994).  In recognizing a constructive trust, the critical requirement for purposes of this case is that the parties have a confidential or fiduciary relationship prior to and apart from the transaction in question.  *Harris v. Sentry Title Co.*, 715 F.2d

---

[7] The evidence also shows that Drillers complied with the subcontractors' lien notice requirements, and therefore have liens on Debtors' interest in the well. As a practical matter, these liens are the same in substance whether we classify them as contractors' liens or subcontractors' liens. As a result, we need not reach the issue of whether Drillers might also have contractors' liens. We therefore do not reach the questions of whether Drillers had an express or implied contract with Debtors, or whether Lakehills was the agent, joint-venturer, or partner of Debtors.

[8] The bankruptcy court also concluded that the equitable lien claims were not adequately pled because Drillers and Debtors did not agree to create any security interest between them, and there is a remedy at law for Drillers, violating two requirements of an equitable lien. Drillers do not brief this point and thus waive it on appeal. *See Kmart Corp. v. Aronds,* 123 F.3d 297, 299 n.4 (5th Cir. 1997) (citing *Cinel v. Connick,* 15 F.3d 1338, 1345 (5th Cir. 1994) (stating that a party who inadequately briefs an issue waives the claim)).

941, 946 (5th Cir. 1983) (citations omitted).  A fiduciary duty must come from a preexisting relationship beyond mere business interactions.  *Id.* As we have previously explained:

> [I]n *Rankin v. Naftalis*, 557 S.W.2d 940 (Tex. 1977), the Supreme Court of Texas refused to impose a constructive trust on oil and gas lease transactions. The court noted that the parties had been involved in a joint venture.  It also recognized that confidential relationships such as partnerships could impose a broader reach for a constructive trust than simple business dealings.  However, the court found that the transactions in question were not based upon the joint venture between the parties.  It refused to extend a fiduciary duty to cover the business dealings, saying: "[s]ubjective business trust, cordiality and the trust which prevails between businessmen which is the foundation of ordinary contract law" could not be a basis for imposing a trust that would thwart the statute of frauds. 557 S.W.2d at 944.

*Id.* at 947.  Likewise, Drillers have not plead sufficient facts demonstrating a special trust relationship here.  Instead, the facts pleaded indicate that they had an ordinary business relationship with Debtors.  As Debtors point out, Drillers rely solely on language in the Settlement Agreement and Option Agreement to try to establish that a special trust relationship existed. However, Drillers did not participated in the negotiation, execution, or performance of these agreements.   In addition, the language of these agreements does not support Drillers' claims.[9]

Drillers also assert that they are entitled to funds from Debtors under the Texas Trust Fund Act.  We disagree.  While the Trust Fund Act might provide Drillers with a claim against Lakehills, it does not give Drillers a claim against Debtors, because Debtors were not contractors.  As one Texas appellate

---

[9] A trust can also be established if an owner behaves fraudulently.  *Haber Oil Co.*, 12 F.3d at 437.  Drillers have neither briefed this issue, nor pleaded facts sufficient to show that Debtors behaved fraudulently.  Any such argument is therefore waived.  *See Kmart*, 123 F.3d at 299.

court has explained, "[t]he Trust Fund Act imposes fiduciary responsibilities on *contractors* to ensure that Texas subcontractors, mechanics, and materialmen are paid for work completed." *Kelly v. Gen. Interior Constr., Inc.*, 262 S.W.3d 79, 84–85 (Tex. App.—Houston [14th Dist.] 2008), *rev'd in part on other grounds*, 301 S.W.3d 653 (Tex. 2010) (emphasis added).

> Under chapter 162, construction payments are trust funds if the payments were made to a contractor or to an officer under a construction contract for improvement of specific real estate in Texas. Tex. Prop. Code Ann. § 162.001. The *contractor or officer* who receives the trust funds is a trustee of the funds. *Id.* [at] § 162.002. The artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or furnishes labor or material for the construction or repair of an improvement on specific real property located in Texas is the beneficiary of any trust funds paid or received in connection with the improvement. *Id.* [at] § 162.003. A trustee who intentionally or knowingly or with the intent to defraud directly or indirectly retains, uses, disburses, or otherwise diverts the funds has misapplied the trust funds.

*Id.* at 85 (emphasis added). The language in Chapter 162 does not support Drillers' argument that a fiduciary relationship also exists between Drillers and Debtors. As a result, Drillers' constructive trust claims were properly dismissed.

## V.

We AFFIRM the district court's dismissal of Drillers' constructive trust and equitable lien claims, and REVERSE the district court's grant of summary judgment on Drillers' subcontractors' lien claims. We REMAND for proceedings consistent with this opinion.