Opinion issued August 28, 2014



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00506-CV

————————————

**RICKEY FONTENOT, Appellant**

**V.**

**LAND AMERICA COMMONWEALTH TITLE OF HOUSTON, INC.,**
**Appellee**

On Appeal from the 253rd District Court
Chambers County, Texas
Trial Court Case No. 25162

## MEMORANDUM OPINION

This appeal arises from a dispute over a sale of land. Rickey Fontenot, the

seller, appeals an adverse jury verdict on his causes of action for fraud and breach

of fiduciary duty against the title company, Land America Commonwealth Title of

Houston, Inc. In three issues, Fontenot challenges the sufficiency of the evidence to support the jury's verdict, and in a fourth issue he challenges the trial court's decision to overrule his motion for new trial, which was also based on the sufficiency of the evidence.

We affirm.

## Background

Rickey Fontenot owned approximately 141 acres of land in Chambers County. John Kelly was the managing partner of the Maverick Group, LLP, and he was the sole manager of Summerfield Partners, GP, LLC, which was the general partner of Summerfield Partners. In November 2005, Kelly approached Fontenot about purchasing the property in Chambers County. Fontenot understood that Kelly was in the business of creating residential developments and that he intended to develop this property for such use. On January 5, 2006, Fontenot entered into an "Unimproved Property Contract" for the purchase of the land by "Maverick Group, LLP or Assigns."

This contract was prepared on a form promulgated by the Texas Real Estate Commission. It provided for the sale of approximately 138 of Fontenot's 141 acres for a total sales price of $2,070,000, with $500,000 payable in cash at the closing, and with seller financing as evidenced by a promissory note in the amount of $1,570,000 (the non-cash portion of the sales price), "secured by vendor's and

2

deed of trust liens, and containing the terms and conditions described in the attached TREC Seller Financing Addendum." The contract provided that "Seller shall furnish to Buyer at . . . Buyer's expense an owner policy of title insurance . . . issued by LandAmerica Commonwealth Title, San Felipe Houston," and that "[i]f an owner policy of title insurance is furnished, Buyer shall furnish Seller with a mortgagee policy of title insurance." It also included certain "special provisions" that were handwritten into the contract, including that "Seller agrees to subordinate entire 141± acres as collateral (security) to lender." The buyer's lender ultimately was International Bank of Commerce (IBC). The form contract's final paragraph stated, "READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract, consult an attorney BEFORE signing." Fontenot and Kelly initialed each page and signed the last page of the contract. Kelly signed on behalf of Maverick Group, indicating that its attorney was Keith Lain. No name was listed in a blank provided on the form for identification of the seller's attorney.

The parties amended the contract in August 2006, but the special provision whereby Fontenot agreed "to subordinate the entire 141 acres as collateral (security) to lender" was unchanged. The Maverick Group paid Fontenot $100,000 as partial payment for the land purchase, and then it assigned the contract to Summerfield Partners.

3

The parties went to closing on November 8, 2006. That day, there was a discussion regarding amending the agreement to convey the entire 141 acres of Fontenot's land. Fontenot did not want to sell the entire tract: he testified that he wished to retain approximately 5 acres of highway frontage on the Kilgore Parkway, a road that was under construction. He testified that Kelly and his business partner "kept trying to force" him to "subordinate the whole 141 acres." They told him that the frontage would eventually be worth nearly $200,000 an acre. In exchange for Fontenot's agreement to convey the entire tract of land, Summerfield Partners, as buyer, increased the purchase price by $75,000 and agreed to sell the five acres fronting on the Kilgore Parkway back to Fontenot for $10.00 after repayment of the IBC loan. Fontenot later testified that an employee of Land America praised him on his "good haggling" in negotiating this deal. Fontenot agreed to this modification of their agreement and to allow Keith Lain, the attorney who represented Summerfield Partners, to draft an amendment reflecting this new agreement. Fontenot, Kelly, and others left for lunch, while Lain prepared the paperwork needed for the closing.

The "Amendment to Earnest Money Contract" that Lain drafted specified that Fontenot's lien would be subordinated to a lien given by the buyer's lender, and that the proceeds of the bank loan would be used to purchase the property:

> As security for the Note, Buyer will give Seller a deed of trust secured by the Property, the lien of which deed of trust will be subordinated to

the lien of the deed of trust which Buyer has given to International Bank of Commerce to secure a loan (the "Bank Loan") for the purchase of the Property.

Lain also drafted a deed of trust, which he later admitted mistakenly failed to include both Fontenot's name and the amount of the indebtedness owed by Summerfield Partners. But he explained that the deed of trust was not ineffective, saying that it nevertheless "impressed a lien against this piece of property" because it referenced the promissory note which identified Fontenot, the money owed, and the same piece of property as described in the deed of trust, and because both the deed of trust and promissory note bore the same general file number. Like the original contract and two amendments, the deed of trust stated that Fontenot had a second lien, which was subordinated to the bank's first lien. Lain named himself as trustee of the deed of trust as a matter of convenience and in accordance with industry custom, but the deed of trust gave Fontenot the right to change the trustee at any time.

Fontenot testified that he felt rushed during the closing:

All the paperwork was just—came back and was stretched out on the table and, you know, after everybody got settled down it was—she—one of the ladies up at the title company just started saying, well, this is your deed of trust. This is this. This is the real estate lien, and this and that, which some of the paperwork I didn't have to sign. But [Kelly] and [Kelly's partner] were sitting right across from me and whatever I had to sign, well, she explained me just briefly what it was. And, you know, you just had—you have to glance at it pretty quick because they were ready to pick that paper up and pass you another paper. And John was in somewhat of a hurry because he had a

Pearland subdivision that he had to go check on. And then he had an airplane that was sitting waiting at Hobby Airport to take him back to Baton Rouge. So by 1:30 we were all gone.

Fontenot signed the documents at closing without reading them, including the contract amendment, even though he knew it was imprudent and unreasonable to do so. He testified that he had misgivings during the closing but did not stop the proceedings to ask questions. For example, he testified that he was not given an opportunity to read the papers at closing because Kelly kept telling him he was running late. Though he said he felt that he was forced to close the deal, Fontenot acknowledged that nobody physically forced him, and that he had the power to stop the closing.

As to whether the title company, Land America, pressured him into proceeding with the closing, he said that there were not "any words spoken" but that "the appearance of them" indicated to him that they "were behind" Kelly. He also testified that his communications with Land America were limited to the comment that he did some "good haggling," exchanging greetings, and communications during the closing in which the escrow agent identified the documents and pointed where to sign. He did not ask anyone at Land America if he could read the documents. Fontenot lamented, "I thought I was dealing with honest people."

But Fontenot had done no due diligence, aside from "word of mouth," before entering into or closing this transaction. He did not: investigate Kelly; ask for financial information from Kelly, the Maverick Group, or Summerfield Partners; secure a promise that the purchaser would in fact develop the land or a personal guarantee for the indebtedness; or review a budget or loan documents between Summerfield Partners and the bank.

Summerfield Partners ultimately defaulted on the bank loan, and in December 2008 it filed for bankruptcy. Fontenot filed suit against Kelly and a separate suit against IBC and the bankruptcy trustee. IBC sued Kelly. Summerfield Partners and Fontenot filed adversary proceedings against each other in the bankruptcy litigation. As a result of proceedings in the bankruptcy court, IBC, Fontenot, and Kelly entered into a "Compromise Settlement and Release Agreement." Among other things, IBC agreed not to foreclose on the property for a period of 20 months, during which time Summerfield Partners and then Fontenot could seek a purchaser. In addition, Fontenot's deed of trust was reformed to include the information that previously had been omitted. Neither Summerfield Partners nor Fontenot found a buyer for the property, and IBC later foreclosed. When the property was sold at a foreclosure sale, the proceeds fell short of the money owed to IBC by approximately $100,000.

Fontenot sued Land America and Lain, alleging causes of action including breach of fiduciary duty, fraud, and conspiracy. At trial Fontenot contended that he had been harmed by nondisclosure of the "true facts" of the transaction prior to the closing. For example, he said that if he had known that the $1,450,000 loan from the bank was not going to be used to develop the property, he "would have never subordinated it to the bank." He said that Kelly never told him that he would be getting a "bank loan" in connection with the purchase of the property. Rather, Fontenot testified that Kelly always represented that he would be getting a "development loan," and that as early as 2006, Kelly had shown him plans for the subdivision he allegedly intended to build. Fontenot said he was deceived into signing the closing papers on the basis that the bank loan would be specifically for development of the property.

In addition, Fontenot contended that nobody told him that the deed of trust prepared by Lain was "incorrect" and did not reserve a "vendor's lien." He testified that he was harmed by the omission of certain information from the deed of trust. He testified that he was damaged as a result of not obtaining a valid lien or title insurance. He requested approximately $2,000,000 in damages.

However, Fontenot acknowledged that Land America had nothing to do with his decision to enter into the contracts with Maverick Group or Summerfield Partners. Though he did not read the documents at closing, he knew that he was

8

selling the full 141 acres of land in Chambers County and that his security would be subordinate to the bank's. In fact, he testified multiple times that he knew as early as January 2006 that the agreement was for his lien to be subordinate to a bank lien and that he understood what that meant: that is, if Summerfield Partners defaulted, the bank would foreclose and he could be left without recourse. He conceded that if he had read the deed of trust at closing he would have seen that his name and the amount of the Summerfield Partners note were omitted and that he was entitled to appoint a new trustee.

At trial, Everett Williams testified on Fontenot's behalf as an expert on title insurance and real estate law. He testified that the deed of trust was defective because it did not reserve a vendor's lien as provided by the pre-printed general provisions of the parties' contract and that Land America had a duty to provide Fontenot with a mortgagee's policy of title insurance. He also opined that everyone other than Fontenot understood the true nature of the transaction as it actually closed:

> I think that there's no question that everybody in the room knew that Fontenot was—had relied on the promise of the buyer that the loan would be a development loan. That's my opinion. And I think that everybody in the room knew that that wasn't the way the deal was being closed.

Williams also testified that it was not the job of an escrow agent to comment on the source of funds delivered to the seller at closing, that Land America had no

9

obligation to inform Fontenot that the $398,000 he received at closing came from the bank loan, and that a title company cannot advise a party regarding the contents of a document. He also acknowledged that Fontenot bargained for a second-lien position and that he was damaged as a result of IBC's foreclosure. He testified that if Kelly and Summerfield Partners had either developed the property or paid its debt to Fontenot, Fontenot would not have suffered damages. He explained that if Fontenot had been able to foreclose before IBC, he would have retaken the property subject to IBC's lien.

On cross-examination, Williams testified that Land America was not a party to the contract that formed the basis of this transaction, and he was aware of no evidence that it had made any representations to Fontenot or intended to defraud him. With respect to the deed of trust and contract amendment, Williams said that Fontenot had all the information he needed before him, but he did not read it. As to the title insurance, Williams testified that Fontenot could have, but did not provide any instructions to Land America with regard to closing, including requesting issuance of a mortgagee's title insurance policy.

John Bushnell Nielson, author of *Title and Escrow Claims Guide*, testified on behalf of Land America as an expert in real estate and escrow. He testified that an escrow officer should identify the documents at closing, invite the party to read them, and show the party where to sign, but not go further and comment on the

merits of the parties' agreement or identify certain information as particularly important. He testified that Land America did not act improperly by not speaking about whether the bank loan would be used for development. He said:

> It is my opinion as an expert witness, to a reasonable degree of certainty, based on my experience in this business, that the decision not to give that kind of information or advice to Mr. Fontenot was correct and was the industry standard, and the giving of such advice would have been wrong according to the industry standards and the way it understands the fiduciary duties that it has.

He also testified that Fontenot's failure to receive a mortgagee's title insurance policy had no effect on him because the deed of trust was always valid and enforceable. He testified that Fontenot did not receive a title insurance policy because he never requested one and that he saw nothing wrong in the closing.

Lain denied that any act or omission on his part harmed Fontenot. He explained that that even if he had not omitted Fontenot's name or the amount of the indebtedness on the deed of trust, he would have been in no better position: his lien would still have been secondary to IBC's, he would not have been entitled to return of the property, and he would not have received full payment from Summerfield Partners. He further testified that it was the bank's foreclosure and sale of the property for less than the amount owed that "extinguished" Fontenot's lien against the property.

Gerald Mark Creighton, a licensed escrow officer, testified as an expert witness on behalf of Lain. He testified that despite the omissions of Fontenot's

name and the amount of the indebtedness, the deed of trust prepared by Lain created a valid lien because it identified the property and mortgagor, and it was signed and recorded. He testified that Lain did not act improperly in naming himself as trustee, and that Fontenot's damages were caused by his initial agreement to subordinate his lien.

At trial, the defendants twice moved for directed verdict, which the trial court denied. The case was submitted to the jury on theories of breach of fiduciary duty, fraud, and conspiracy. As to Lain, the breach of fiduciary duty question was predicated on the jury's answer to a question that asked if he was Fontenot's attorney. The jury found in favor of the defendants on all questions, and Fontenot moved for a new trial arguing that the evidence was insufficient to support the verdict. The trial court denied Fontenot's motion for new trial and rendered judgment that he take nothing by way of his lawsuit. Fontenot appealed.

## Analysis

### I.    Fiduciary duty

In his first issue, Fontenot challenges the legal and factual sufficiency of the evidence to support the jury's verdict that Land America did not proximately cause him harm by breaching a fiduciary duty.

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on an issue as to which he had the burden of proof,

12

he must show that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). We first examine the record for evidence supporting the finding, and we next examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* We sustain the issue only if the contrary position is conclusively established. *Id.* "When a party attacks the factual sufficiency of an adverse finding on an issue on which he has the burden of proof, he must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Id.* at 242. A "court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

The fact-finder is the sole judge of the witnesses' credibility and the weight to be given their testimony, and the fact-finder may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). We assume that the fact-finder resolved all evidentiary conflicts in accordance with its decision if a reasonable person could have done so. *See id.* An appellate court may not impose its own opinion contrary to the fact-finder's implicit credibility determinations. *Id.*

The gravamen of Fontenot's theory of the case against Land America, the title company, is that it failed to explain the substance of the deal that was closed on November 8, 2006. He contends that the escrow officers understood, but failed to explain to him, that the bank loan to Summerfield Partners was not restricted for use only to develop the land. He argues that as a fiduciary, Land America had a duty to explain the nature of the transaction, and it failed to do so. He further contends that Land America also should have told him: the deed of trust was defective because his name was not listed therein; he did not get a vendor's lien in the deed of trust; the escrow agents did not read the entirety of the closing document; the $500,000 cash portion of the sales price for his property was withdrawn from "his" improvement loan; he was not receiving valid liens; and he was not named as the beneficiary in the deed of trust. In addition, he faults Land America for not providing him with a mortgagee policy of title insurance.

Because Fontenot did not object to the court's charge, we measure the sufficiency of the evidence against that standard. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). With respect to fiduciary duty, the charge asked:

> Did the breach of fiduciary duty, if any, of those named below proximately cause harm to Fontenot?
>
> To prove that Land America breached a fiduciary duty to Fontenot, Fontenot must prove that:
>
> > 1. The transaction in question was not fair and equitable to Fontenot;

14

2. Land America failed to make reasonable use of the confidence that Fontenot placed in it;

3. Land America failed to act in the utmost good faith or exercise the most scrupulous honesty toward Fontenot;

4. Land America failed to place the interests of Fontenot before its own, used the advantage of its position to gain a benefit for itself at the expense of Fontenot, or placed itself in a position where its self-interest might conflict with its obligations as a fiduciary; or

5. Land America failed to fully and fairly disclose all important information to Fontenot concerning the transaction in question.

Fontenot's appellate argument focuses on the five alternative theories of a breach of fiduciary duty that were identified in the court's charge. However, the jury question did not merely ask if Land America breached a fiduciary duty: it specifically asked whether the breach of fiduciary duty, if any, harmed Fontenot.

The evidence at trial did not establish the element of causation. For example, Fontenot said he felt pressured by Kelly to renegotiate the sale on the day of closing to include the full tract of land. But he also testified that Land America did not exert any such pressure on him. Fontenot testified that he believed he was misled and harmed because Kelly had represented to him that he would use the funds from a bank loan to develop the property and later return the highway frontage to him, after it increased in value. But there was no evidence that Land America played any role whatsoever in those representations. In fact, Fontenot

testified that aside from a few casual pleasantries, the only communication he had with anyone from Land America consisted of the words spoken during closing when the escrow agent identified the closing documents for him.

Fontenot testified that he entered into the contract without performing any due diligence about the buyer except for "word of mouth," and that he signed the closing papers without reading them. Texas law has long held that a party who signs a contract is presumed to have read it and understood it unless he was prevented from doing so by fraud. *See, e.g.*, *In re Int'l Profit Assocs., Inc.*, 286 S.W.3d 921, 923 (Tex. 2009) (holding that party who signs document is presumed to know its contents); *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996) (same); *Indem. Ins. Co. of N. Am. v. W. L. Macatee & Sons*, 101 S.W.2d 553, 556 (Tex. 1937); *Womack v. W. Union Tel. Co.*, 58 Tex. 176, 179 (1882) ("The sound and practical rule of law in such cases is, that, in the absence of fraud or imposition, a party to a contract, which has been voluntarily signed and executed by him, with full opportunity for information as to its contents, cannot avoid it on the ground of his own negligence or omission to read it."). Fontenot testified that Land America had nothing to do with his decision to enter into the original contract with the Maverick Group, as buyer, or the amended contract with Summerfield Partners.

16

Fontenot also testified multiple times that from the inception of his deal with Kelly, beginning in January 2006, he understood his lien would be inferior to a lien to be held by a bank lender, and that if the buyer defaulted and the bank foreclosed, he could have no recourse. Under well-established Texas law, "if, after a valid foreclosure of a senior lien, a junior lien is not satisfied from the proceeds of a sale, then the junior lien is extinguished." *Kothari v. Oyervidez*, 373 S.W.3d 801, 807 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *accord Diversified Mortg. Investors v. Lloyd D. Blaylock Gen. Contractor, Inc.*, 576 S.W.2d 794, 808 (Tex. 1978); *Nat'l W. Life Ins. Co. v. Acreman*, 425 S.W.2d 815, 817 (Tex. 1968); *Jones v. Bank United of Tex., FSB*, 51 S.W.3d 341, 344 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

Fontenot's own expert witness, Williams, testified that Fontenot was injured as a result of IBC's foreclosure of its lien, and that had Summerfield Partners either developed the land or paid the bank loan, he would not have been harmed. Lain's expert, Creighton, similarly testified that it was Fontenot's original agreement to subrogate his lien and IBC's later foreclosure that caused his damages. Accordingly, we conclude that the evidence does not conclusively establish that a breach of fiduciary duty by Land America, if any, caused Fontenot harm or that the jury's verdict in that regard is so against the great weight and preponderance of the

17

evidence that it is clearly wrong and unjust. *See Francis*, 46 S.W.3d at 241–42. We overrule Fontenot's first issue.

## II.    Fraud

In his second issue, Fontenot contends that there is no evidence or insufficient evidence to support the jury's negative answer to the fraud question, which asked "did the fraud, if any" of Land America "proximately cause harm" to him. In his brief, Fontenot argues that whether an act of fraud has been committed is a question of law for the court. His brief provides a single citation to the record, referencing the entirety of his motion for new trial and quoting *Bradford v. Vento*, 48 S.W.3d 749 (Tex. 2001), which was cited therein. Appellant's Br. 27–28. In his motion for new trial, Fontenot relied on *Bradford* for the proposition that, in the context of a claim for fraud based on a party's failure to disclose a material fact, the existence of a duty to speak is a question of law. *See Bradford*, 48 S.W.3d at 755; Appellant's Br. 27–28. We have already explained that the gravamen of Fontenot's case against the title company is that Land America failed to explain the substance of his underlying transaction with Summerfield Partners. However, under Texas law, Land America had no obligation to do so. *See Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 733 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Shoalmire v. U.S. Title of Harrison Cnty.*, No. 06-09-00034-

CV, 2010 WL 271302, at *5 (Tex. App.—Texarkana Jan. 26, 2010, no pet.) (mem. op.).

Fontenot further states that he "submits that this Court has the power and authority to determine from the facts presented whether or not fraud by non-disclosure by Appellee, LAND AMERICA, has been committed," reasoning that "[s]uch a finding by this Court from the record would not invade the province of the jury verdict." Appellant's Br. 28. His reply brief adds little more. Appellant's Reply Br. 17–19. In it, he reiterates his contention that the question of whether fraud has been committed is a legal inquiry, not a factual one. *Id.* at 17–18. He renews his request "that this Court review the record and determine as a matter of law that Appellee, LAND AMERICA owed a duty to Appellant, FONTENOT as a matter of law and fraudulently breached this duty in remaining silent when it had a duty to speak."

The Rules of Appellate Procedure require the appellant's brief to contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and the record." TEX. R. APP. P. 38.1(i). We interpret this requirement reasonably and liberally. *See Republic Underwriters Ins. Co. v. Mex-Tex., Inc.*, 150 S.W.3d 423, 427 (Tex. 2004) (citing *Verburgt v. Dorner*, 959 S.W.2d 615, 616–17 (Tex. 1997)). "Nonetheless, parties asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law supports

19

their contentions." *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.). "Additionally, appellate courts are not required to sift through the record without guidance from the party to find support for a party's bare assertion of error." *Crider v. Crider*, No. 01-10-00268-CV, 2011 WL 2651794, at *5 (Tex. App.—Houston [1st Dist.] July 7, 2011, pet. denied) (mem. op.); *see Nguyen v. Kosnoski*, 93 S.W.3d 186, 188 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("This Court has no duty to search a voluminous record without guidance from Nguyen to determine whether an assertion of reversible error is valid."). "[E]rror may be waived by inadequate briefing." *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994).

Fontenot's brief does not contain a clear or concise basis for his contention that the record would show as a matter of law that Land America committed fraud against him or that the great weight and preponderance of the evidence would compel such a conclusion. Rather than providing citations to the record or supporting authority, he requests that the court search the record of a five-day trial for evidence to support his broad assertion of reversible error. We decline this request and overrule this issue as inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *Crider*, 2011 WL 2651794, at *5; *San Saba Energy*, 171 S.W.3d at 338.

### III. Motion for new trial

In his third issue, Fontenot argues that the trial court erred by overruling his Amended Motion for New Trial. He argues about the adequacy of the jury charge, but he does not provide citations to the record or any legal authority in support of this issue. His entire argument on this issue comprises one paragraph which states:

> In retrospect, Appellant, FONTENOT, submits to this Court the instructions and definitions were ambiguous and difficult to understand which led to an improper verdict in this case. This is evident by the fact that the jury in its deliberations spent approximately fifteen (15) minutes before returning with a verdict. This is not sufficient time for the jury to have read the charge. In addition, the jury returned insufficient answers to the questions proposed in the charge. The Court permitted the jury with the approval of counsel to reconvene in the jury room to correct the flawed questions. Appellant, FONTENOT, submits that the jury did not discuss a single page of evidence to reach its verdict in this case.

Appellant's Br. 28. "Our procedural rules state that a complaint to a jury charge is waived unless specifically included in an objection." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829 (Tex. 2012) (citing TEX. R. CIV. P. 274 and TEX. R. APP. P. 33.1(a)(1)). At the formal charge conference, Fontenot's counsel affirmatively stated that he had no objections to the court's charge. To the extent this issue pertains to the court's charge, it is waived. To the extent that Fontenot intended to challenge some other aspect of the court's ruling denying his motion for new trial, the issue is inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *Crider*, 2011 WL

2651794, at *5; *San Saba Energy*, 171 S.W.3d at 338. We overrule Fontenot's third issue.

## IV.    Factual sufficiency of the evidence

In his fourth issue, Fontenot contends that the "jury finding in this case is factually insufficient and against the weight and preponderance of the evidence as to be manifestly unjust and shocks the conscience." Appellant's Br. 28. In particular, he argues that Land America's expert witness, John Bushnell Nielson, was "biased and prejudice[d]." He urges the court to find as a matter of law that Land America "fraudulently breached" a duty by "remaining silent when it had a duty to speak." Appellant's Br. 30.

To the extent that Fontenot rests his argument on the insufficiency of Nielson's testimony, we note first that he did not challenge Nielson's credentials as an expert witness. When Land America tendered Nielson as an expert witness on escrow relationships in the title insurance industry, the trial court asked if Fontenot had any objection. Fontenot's attorney responded, "I have no objections. I suspect he's done what he said."

Second, we note that a witness's alleged bias or prejudice are matters that factor into the fact-finder's credibility determination. *See Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 711 (Tex. App.—Houston [1st Dist.] 1988, writ denied) ("Generally, a party has the right to cross-examine an adverse party to show

22

interest, bias, or prejudice that would affect the witness' credibility."); *Hammond v. Stricklen*, 498 S.W.2d 356, 362 (Tex. App.—Tyler 1973, writ ref'd n.r.e.) ("On cross-examination of an adverse witness, anything may be shown which might affect the witness' credibility, such as bias, interest and prejudice and a wide latitude is allowed in such matters.").

Fontenot bases his argument that Nielson's testimony was biased or prejudiced, in part, on an exchange during cross-examination when he professed an inability to identify any facts that would weigh in favor of Fontenot's theory of the case. Appellant's Br. 29. But the jury did not hear this singular response in isolation. Nielson testified about his credentials and experience. He testified that as between the parties, Fontenot was entitled to a title insurance policy to be provided by the purchaser, Summerfield Partners. He also testified that Land America did not have a duty to provide him with a policy of title insurance without a request or any payment of the premium. The jury was entitled to credit or disregard his testimony, and we may not overturn a fact-finder's implicit credibility determination when, as here, a reasonable person could have believed the testimony. *See Wilson*, 168 S.W.3d at 819.

In addition, we have already explained that the evidence does not conclusively establish the necessary element of causation, nor is the jury's verdict that Land America did not harm Fontenot against the great weight and

preponderance of the evidence such that it is clearly wrong and unjust. *See Francis*, 46 S.W.3d at 241–42. Accordingly, we overrule this issue.

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Massengale and Huddle.